ELLA F. GUILD *vs.* EASTERN TRUST AND BANKING COMPANY ET AL.

Penobscot.    Opinion December 18, 1924.

*In an action on a check by payee against the executor of the estate of the drawer, who deceased before the check could be presented to the drawee for payment, it being claimed that the check was in part payment of an amount the drawer had promised, orally, and prior thereto, to pay to payee in consideration of marriage, an affidavit in support of the claim presented by the plaintiff against the estate of the decedent is not admissible as evidence in behalf of the plaintiff of the facts therein stated; it is admissible in her behalf only to show that the claim in suit was properly presented; it is admissible as evidence against the plaintiff of any facts therein stated which militate against plaintiff's contention.    The facts so stated must be considered in the light of admissions against interest.*

In the instant case the statement signed by the plaintiff, dated and verified by her oath on March 5, 1921, containing a full statement of her relations with the decedent which led to the giving of the check in question, is not admissible as evidence in behalf of the plaintiff of the facts therein stated; it is admissible in behalf of the defendant so far as its statements of facts controvert the contentions made in plaintiff's behalf.

In her first statement the plaintiff said: "Mr. Hill intended the check to be in part performance of the undertaking we had reached at the time we became engaged to be married;" she made substantially the same statement in her proof of claim.    The jury were correctly instructed that the plaintiff could not recover, if they believed the plaintiff's statement above quoted, as such understanding was alleged by plaintiff and set forth in her statement, and were further instructed at length to the same effect, the plaintiff's statement of the understanding referred to being read to them.    Upon these instructions the jury should have found for the defendant, and unmistakably erred in failing to give effect to the written statements of the plaintiff.

The theory of even a tacit renewal by the plaintiff of her promise to marry, and the delivery of the check by the decedent in consideration of her promise then and there renewed to marry him, and that she received the check understanding his intention and participating in it, finds no support in the present records.

On motion and exceptions by defendant.    An action of assumpsit brought by the plaintiff against the executors of the will of Frederick W. Hill, late of Bangor, deceased.    The action was based on a check drawn by Frederick W. Hill on April 10, 1920, for seventy-five

thousand dollars, on the Eastern Trust and Banking Company, payable to the plaintiff and given to the plaintiff by the drawer on the day it was drawn. The drawer deceased on the day the check was drawn and on presentment of the check to the drawee on April 12, 1920, acceptance and payment was refused. After the defendants were appointed executors of the will of the said Frederick W. Hill demand of payment of the check was made upon them, but payment was refused. The defendants pleaded the general issue, the statute of frauds and under a brief statement alleged want of consideration. At the conclusion of testimony counsel for defendants filed a motion for a directed verdict for defendants, which the presiding Justice refused, and defendants excepted. A verdict for $88,350 was rendered for plaintiff, and defendants filed a general motion for a new trial. Other exceptions were taken but not considered. Motion sustained. New trial granted. Exception to refusal to direct a verdict for defendants sustained. This is the second trial of this case, the first one being reported in 122 Maine, 514.

The case is fully stated in the opinion.

*Louis C. Stearns and Alfred A. Shaefer*, for plaintiff.

*Ryder & Simpson*, for defendants.

SITTING: CORNISH, C. J., PHILBROOK, MORRILL, WILSON, STURGIS, JJ.

MORRILL, J. Frederick W. Hill late of Bangor, died April 10, 1920. On April 25, 1921, the plaintiff presented her written claim, against his estate, verified by her affidavit, which she therein states "is intended to be a presentment of four distinct claims against the estate of Frederick W. Hill," but which in fact presents only two distinct claims, one upon the check to be immediately referred to, the other for $300,000 alleged to be due upon an oral ante-nuptial agreement.

Three of said claims as presented are based upon a check for $75,000, dated April 10, 1920, drawn by the deceased in favor of the plaintiff and delivered to her a few hours before he died. The only consideration for the check stated in the claim is that it was drawn and delivered "in part performance of an agreement entered into by said Hill and myself in the spring of 1919, it being provided by said agreement that if and when said Hill and I should enter into an

engagement of marriage he would settle funds or property upon me sufficient to make me financially independent." The engagement of marriage is alleged.

The fourth claim so presented is for $300,000, "being the sum now due me from said estate under an agreement made in the spring of 1919 between said Hill and myself, said agreement providing that if said Hill and I should enter into an engagement of marriage he would settle funds or property upon me sufficient to make me financially independent." The engagement of marriage is alleged.

This action is upon the check described in the first three claims so presented, and has previously been before the Law Court (122 Maine, 514) upon exceptions to a ruling directing a verdict for defendant. In the opinion then rendered it is said: "We think that the plaintiff's exceptions should be sustained . . . . because a promise to marry is not in any case within the Statute of Frauds." That question was not necessarily involved in the ruling then under consideration, and does not appear to have been, and in fact was not, the ground of the ruling at the former trial.

The controlling reason for sustaining the exceptions on the former occasion is stated at the close of the opinion,—that the jury might have found "that an agreement was made in January (1920) as testified to by Henry Guild; . . . . that in the delivery of the check on April 10th the testator intended to so deliver it in consideration of the renewal or continuance of the plaintiff's promise to marry him;—that in receiving the check the plaintiff understood Mr. Hill's intention, participated in it and so received the check in consideration of the continuance or renewal of her promise."

Throughout the opinion the case is discussed upon the theory of an engagement of marriage in January, 1920 and an oral promise by Mr. Hill at that time to settle $500,000 upon Mrs. Guild, as testified by Henry J. Guild whose testimony is quoted in the opinion. (122 Maine, 518).

The issue was also thus stated:

"Was the check proffered and received on April 10th as a gift prompted by relationship, friendship or love? or did the parties mutually intend to renew the promise which made before had been ineffective for want of a consideration?" (122 Maine, 523).

The case is now before us upon exceptions to a ruling denying a motion for a directed verdict in favor of defendant, to certain instruc-

tions to the jury, and upon a general motion for a new trial. The foregoing reference to the earlier opinion is considered necessary for a clear understanding of the theory upon which the case was submitted to the jury at the second trial.

The proof of claim which has been referred to is made a part of the present case. It is not admissible as evidence in behalf of the plaintiff of the facts therein stated; it is admissible in her behalf only to show that the claim in suit was properly presented; it is admissible as evidence against the plaintiff of any facts therein stated which militate against plaintiff's contention.

In addition to the proof, we have before us for the first time a statement signed by Mrs. Guild, dated and verified by her oath on March 5, 1921, which gives such a full and frank statement of her relations with Mr. Hill which led to the giving of the check in question, and is so convincing of its truthfulness, that we regard it as of controlling influence in the decision of this case. This statement, like the proof of claim, is not admissible as evidence in behalf of Mrs. Guild of the facts therein stated; it is admissible in behalf of the defendant so far as its statements of facts controvert the contentions made in plaintiff's behalf in the present case; the facts so stated must be considered in the light of admissions against interest. The evidentiary value of this statement is of the same character as that of the proof of claim.

This statement by Mrs. Guild of March 5, 1921, discloses the intimate relations of kinship and friendship, which existed for more than twenty-five years, ante-dating the death of Mrs. Hill in 1915, which led the latter in her last illness to ask Mrs. Guild to take care of Mr. Hill in case of her death; which made Mr. Hill a daily visitor at the plaintiff's home, led to substantial gifts to the plaintiff and her children, to the making of a will in which the plaintiff was given a legacy of $100,000, and substantial legacies were also given to her children, and finally to an engagement of marriage; this culmination of relations, which "give significance and color" to the making and delivery of the check in question on April 10, 1920, is best described in Mrs. Guild's own words:

"In the spring of 1918 Mr. Hill declared his affection for me and proposed marriage. I myself had great affection for Mr. Hill and would have married him except for my doubts whether such a plan might not interfere with the happiness of my family, that it might be

thought undesirable by my children, and that in one way or another, either on his account or on theirs, friction might develop between them.    I had in mind also that it might be thought I was marrying Mr. Hill for mercenary reasons.    From that time on, however, Mr. Hill besought me constantly—almost daily—to marry him, insisting that I need have no fears on any possible score.    At the time of his marriage proposal he suggested changing his will again and making my legacy considerably larger, but I requested him not to do this for the reason that if anything happened to him I might find myself the subject of remark.    Through that summer and the following winter he continued to urge his marriage proposal, and in the spring of 1919 he suggested an arrangement which he believed would relieve my doubts.    He wanted me, as soon as our engagement became a fact, to make over to my boys all the property which I myself then owned, he at the same time to settle property upon me sufficient to make me absolutely independent, stating, among other reasons, that this would care for me in case anything happened to him before the marriage itself took place.    He named no amount at the time, but later proposed $500,000 to both Henry and me, but we were unwilling to consider any exact sum, and told him that anything of that sort which he did must be in such amount as he himself should decide to be best.    This arrangement seemed to me to do away with some of the objections and possible embarrassments which had theretofore stood in my way, and it was agreed between us that we would be married."

Then follows the account of their plans for marriage, and the necessary postponement, first in August, then at Christmas, then on account of sickness in Mrs. Guild's family,    They "still planned to be married, as soon as circumstances would permit."    On February 27, 1920, Mr. Hill was stricken with the illness which proved to be his last.    The next day he came to the house of the plaintiff, and from that date until he died he did not leave the house or even come down stairs; during his illness he transferred to the plaintiff securities of $40,000 par value; he worked upon redrafting his will.    Mrs. Guild says in her statement referred to:    "He planned at that time to give me $500,000, either *by gift or legacy.*    He was urgent during this period that we should be married on the spot, his chief reason being that this would secure me financially.    I was unwilling, how-

ever, to have him go through the strain of such proceedings." After describing the occurrences when the check was made and delivered, she closes the statement thus:

"To the best of my recollection, the foregoing statement sets out everything which might be material or important in connection with the check referred to. Mr. Hill intended the check to be in part performance of the understanding we had reached at the time we became engaged to be married."

The last sentence quoted is the same assertion made in the proof of claim; we think that it is decisive of the case. The proof of claim links the delivery of the check on April 10, 1920, with the agreement made by Mr. Hill in the spring of 1919. The jury were instructed that the plaintiff could not recover, if they believed the plaintiff's own written statement that "Mr. Hill intended the check to be in part performance of the understanding" reached by plaintiff and Mr. Hill at the time they became engaged to be married, as such understanding is alleged by plaintiff and set forth in plaintiff's written statement. They were also instructed to the same effect more at length, the plaintiff's statement of the understanding referred to being read to them at length.

No exceptions to these instructions were taken by counsel for the plaintiff. They were in accord with the former decision in this case. *Guild* v. *Banking Co.*, 122 Maine, 514, 521. Browne on Statute of Frauds, 3 Ed., Sec. 215.

The truthfulness of Mrs. Guild's statement is apparent; there is nothing in the record to refute it. The conversations of Mr. Hill with Henry J. Guild in January, 1920, as given by the latter on the present record, did not disclose an engagement to be married then made, but referred to such an engagement as already existing and to his decision to make the amount of the settlement $500,000; it is in exact accord with Mrs. Guild's statement: "He named no amount at the time, but later proposed $500,000 to both Henry and me, but we were unwilling to consider any exact sum, and told him that anything of that sort which he did must be in such amount as he should decide to be best."

Upon these instructions the jury should have found for the defendant, and unmistakably erred in failing to give effect to the statements of Mrs. Guild.

Upon the theory, however, of a renewal of her promise by Mrs. Guild when the check was given, in consideration of which Mr. Hill gave the check in question and orally promised to "fix up. the rest" if he lived until Monday, the jury was instructed that if they found a mutual promise of marriage, they must go further and determine that the promise of marriage was intended by both. of. the parties at the time the check was given as a consideration. After discussing this issue the learned Justice submitted the case to the jury in the following language: .

"Now did Mr. Hill have in mind when he gave this check that he was giving it to, her, handing it to her and delivering it to her in consideration of her promise *then and there renewed to marry him?* And did she in receiving it understand what his intention was, and did she participate in that intention? If so, while there was nothing at the time said about marriage, you would be justified in finding a verdict for the plaintiff. But if there had not been anything said in the past about marriage there would be nothing to base such a judgment upon. And even if there had been an agreement of marriage, if at that time he did not have it in mind, if the idea of marriage had been given up in view of his extremity, his illness, if he did not intend it in consideration of marriage, and *if what he intended was to give it to her,* then the plaintiff cannot recover."

The theory of even a tacit renewal by Mrs. Guild of her promise to marry, and the delivery of the check by Mr. Hill in consideration of her promise then and there renewed to marry him, and that she received the check understanding Mr. Hill's intention and participating in it, finds no support in the record. It is controverted by Mrs. Guild, on her part, in her statement of March 5, 1921, and in her formal proof of claim. As to Mr. Hill's attitude when the check was given, the record unmistakably shows that throughout the period of his illness the predominant thought in his mind was that Mrs. Guild should be secured financially; if he thought of marriage during that period, it was only to promote her security financially, by urging an immediate solemnization, to which she was unwilling to consent.

That no thought of a renewal of the marriage promise was in Mr. Hill's mind when the check was given is conclusively shown by the statement of Mrs. Guild and the testimony of Miss Sharpe, the nurse. They do not disagree in any essential particular. Mrs. Guild says:

"At about noon time that day, (April 10) shortly before lunch, he called for a blank check and writing materials, *this without any previous reference to anything of that sort.* When the check was brought, he made out and delivered to me the check to my order for $75,000. . . . . He asked Miss Sharpe, the nurse, to witness the check. A little while afterward he told me that he was going to turn over to me the balance of my settlement as soon as possible, but at seven o'clock that evening he had another attack. He seemed for a time to recover, but between twelve and one o'clock that night he suddenly died. The $75,000 check was of course not presented to the bank until after Mr. Hill's death."

The testimony of Miss Sharpe discloses that the impulse to give this check came to Mr. Hill shortly after two o'clock in the morning; that through her ministrations he fell asleep; that upon awakening "he was still anxious to write, to do some writing;" that after a while he went to sleep again. She continues:

"But in the morning about quarter of twelve—he passed a fairly comfortable morning and then he woke up, and he felt so well again and he said he must do some writing, and Mrs. Guild came in and he asked for a check, and Mrs. Guild asked if she should write it for him, and he said no, he would do it himself, and I got the table and Mrs. Guild got the check, and he wrote out this check, and he asked me to witness it, and I think I had written my first name, and he asked me if I had read the check, and he said, 'Don't ever put your name on a paper that you don't know what you are signing,' and I read the check aloud to him and finished, and he called Mrs. Guild and gave it to her and said 'Here is this, and if I live until Monday I will fix up the rest'."

This scene does not present a man contemplating a renewal of a promise of marriage; it does not portray Mr. Hill as giving to the woman, whom he had expected to marry, and with whom an engagement of marriage was unbroken, a check in consideration of her promise then and there renewed to marry him. It portrays a man, conscious that death might come at any time, who had heard "the rustle of his sombre robe," and was anxious to complete a provision for the financial security of Mrs. Guild. Mr. Hill's acts are in perfect accord with Mrs. Guild's statement that "Mr. Hill intended the check to be in part performance of the understanding we had reached at the time we became engaged to be married."

The jury unmistakably erred, perhaps in an excusable wish to carry out Mr. Hill's purposes, which death had interrupted before their full execution. To sustain the verdict, however, upon the issue submitted to the jury, that of a renewal by Mrs. Guild of her promise to marry Mr. Hill, and of her acceptance of the check knowing that it was the intention of Mr. Hill to give it in consideration of such renewal, is under the circumstances to attribute to Mrs. Guild mercenary motives which the record shows were foreign to her nature.

*Motion sustained.*
*New trial granted.*
*Exception to refusal to direct*
*a verdict for defendant sus-*
*tained.*